UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 07-CV-10316-JLT

NATALE COSENZA,
Petitioner

v.

JOHN MARSHALL,
Respondent

MEMORANDUM OF LAW IN SUPPORT OF
REQUEST FOR CERTIFICATE OF APPEALABILITY

The Petitioner in the above-referenced matter has sought a Certificate of Appealability (COA) from the denial of his Petition for habeas corpus pursuant to 28 U.S.C. § 2254.  This memorandum is offered in support of that request.

## Standard of Review

Title 28 U.S.C. § 2253(c)(2) provides that in order to obtain a COA on an issue, an applicant must make a "substantial showing of the denial of a constitutional right."  According to the United States Supreme Court, this standard requires that a petitioner

> sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" [Slack v. McDaniel,] 529 U.S. [473], at 484, (2000) (quoting Barefoot[ v. Estelle, 462 U.S. 880,] 893, n. 4, [1983)].

> The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a

general assessment of their merits.  We look to the
District Court's application of AEDPA to petitioner's
constitutional claims and ask whether that resolution was
debatable amongst jurists of reason.  This threshold
inquiry does not require full consideration of the
factual or legal bases adduced in support of the claims.
In fact, the statute forbids it. . . . [A] COA does not
require a showing that the appeal will succeed.
Accordingly, a court of appeals should not decline the
application for a COA merely because it believes the
applicant will not demonstrate an entitlement to relief.
. . . It is consistent with § 2253 that a COA will issue
in some instances where there is no certainty of ultimate
relief.  After all, when a COA is sought, the whole
premise is that the prisoner " 'has already failed in
that endeavor.' " Barefoot, supra, at 893, n. 4. . . .
[I]ssuance of a COA must not be pro forma or a matter of
course.  A prisoner seeking a COA must prove " 'something
more than the absence of frivolity' " or the existence of
mere "good faith" on his or her part. Barefoot, supra, at
893.  We do not require petitioner to prove, before the
issuance of a COA, that some jurists would grant the
petition for habeas corpus.  Indeed, a claim can be
debatable even though every jurist of reason might agree,
after the COA has been granted and the case has received
full consideration, that petitioner will not prevail.

Miller El v. Cockrell, 537 U.S. 322, 336-38 (2003).

Finally, the First Circuit has held that a district court may,

and should, issue certificates of appealability in the first

instance.  See Grant-Chase v. Commissioner, 145 F.3d 431, 435 (1st

Cir.), cert. denied, 525 U.S. 941 (1998) ("[W]e observe that every

court of appeals that has considered the question has concluded

that a district judge may issue a COA. . . . [W]e endorse the[se]

views . . . and explicitly now hold that a district judge has the

authority under the AEDPA to issue a COA under 28 U.S.C. § 2253(c)

and Fed. R. App. P. 22(b)").

## Petitioner's Claim

**THE TRIAL JUDGE VIOLATED THE DEFENDANT'S SIXTH AMENDMENT RIGHT TO PRESENT A DEFENSE WHEN HE DENIED THE DEFENDANT'S REQUEST TO PRESENT THE TESTIMONY OF AN EXPERT ON EYEWITNESS IDENTIFICATION**

The Commonwealth's case against Mr. Cosenza depended entirely upon a single eye-witness identification. This identification was the product of the most unreliable circumstances imaginable. The victim, Melissa Horgan, awoke at 4:00 a.m. in a dark room[1] to find an unknown man sitting at the foot of her bed. When she asked who he was, he immediately began beating her in the head with a hard object. She immediately covered her head with her arms to protect herself. The attacker then climbed on her bed at which point she began kicking him. He then fled from her apartment. This encounter in a dark room lasted no more than a few seconds and was marked throughout by surprise, stress and fear.

---

[1] The Magistrate claimed that "The parking lot of the apartment was lit with large bright lights. The windows in the victim's room faced the parking lot and the lights partially lit her room. This provided the victim some opportunity to see her assailant despite the early hour of the morning." Report at 3-4. The Court's factual claim is simply not supported by the record. To begin, the attack occurred at 4:00 a.m. Tr. 5:79. Ms. Horgan had been sleeping and the lights in her bedroom were turned off. Tr. 5:112. Also, there was an exterior balcony immediately outside the glass door in Ms. Horgan's bedroom separating the bedroom from the parking lot. This balcony was sufficiently dark that it required a light of its own. Robert Payton testified that the balcony light immediately outside of Ms. Horgan's room was broken. Tr. 5:54. Most importantly, Trial Exhibit 16 is a photograph of Ms. Horgan's bedroom as it appeared at the time of the attack. It illustrates quite clearly that the blinds covering her glass door were closed tightly and would have blocked out virtually all ambient light. Ms. Horgan verified that Exhibit 16 accurately depicted  how the blinds were closed at the time of the attack. Tr. 5:136.

3

More than a day later, Ms. Horgan identified Mr. Cosenza as her assailant from a nine photo array.  Although Ms. Horgan claimed that she hd never seen her assailant before, it is possible that she was familiar with Mr. Cosenza's photograph not because he was her assailant, but rather because he had been her neighbor for more than a year.  He lived in an adjacent condominium building and they shared a parking lot.[2]  More troubling, Ms. Horgan refused to view a second photo array later on to confirm her choice of Mr. Cosenza as her assailant.

Against this backdrop, the defense filed a motion for funds for an expert on eye-witness identification.  Appendix (App.) Exhibit G at 50.  The motion was granted in the amount of $1,200.  Id.  Later, after locating an expert in Dayton, Ohio, and learning that his fee would exceed $1,200, the defense filed a second motion for funds.  App. G:52.  A  judge denied this motion.  Id.  The Defendant appealed to a single justice of the Appeals Court.  App. G:82.  The single justice issued the following order:

> Judgement affirmed - Order: Upon review of the relevant portions of the record below and the trial court judge's findings, the denial of the appellant's motion for expenses for this particular expert, pursuant to G.L. c. 261, § 27C, is affirmed.  This action is without prejudice to renewal, submitting a different expert with similar qualifications who is more immediately available (i.e. local).

---

[2] The Magistrate claimed that Mr. Cosenza "did not live in the apartment complex."  Report at 5.  This is flatly wrong.  Mr. Cosenza did live in an apartment in the complex, owned by his father.  Tr. 6:96.

4

App. G:83.  Defense counsel eventually located another expert, Dr.
Steven Penrod, a professor at John Jay College of Criminal Justice
in New York.  Counsel then filed another motion for funds and a
supporting affidavit.  App. G:84.  A judge allowed this motion in
the amount of $3,000.  Id.

Immediately prior to trial, defense counsel filed a Motion in
Limine "to Allow Expert Evidence Regarding Eyewitness Testimony."
App. G:104.  Counsel argued that because Mr. Cosenza and Ms. Horgan
had been neighbors for more than a year prior to the crime, Ms.
Horgan's identification of Mr. Cosenza as her assailant might have
been the result of "unconscious transference."  Id.  Counsel
asserted that his expert would be able to explain that unconscious
transference occurs when a witness identifies a person as a
perpetrator when in fact he is merely a person the witness has seen
previously.  Id.  Dr. Penrod would have also testified about the
effects of extreme stress, a witness's level of confidence in her
identification, the passage of time, and poor lighting on the
accuracy and reliability of a subsequent identification.  Id.[3]
Despite the fact that a motion for funds had been allowed, an
expert had been hired, the case hinged entirely upon a single

---

[3] Dr. Penrod could have also explained that the reliability
of Ms. Horgan's identification was undermined by the fact that
she viewed all of the photographs in the array simultaneously
rather than sequentially.  Mot. to Suppr. Tr. 1:25.
Psychologists have determined that the use of simultaneous arrays
leads to an unreliable "relative judgment process."  See Gary L.
Wells, What Do We Know About Eye-Witness Identification?, 48
American Psychologist 553-571 (1993).

eyewitness identification, and the defense had articulated multiple specific factual bases for admitting the expert testimony, the trial judge denied the motion.  Tr. 3:23.  Defense counsel then requested a voir dire on the issue.  The trial judge denied that request as well.  Tr. 3:24.

A criminal defendant has a constitutional right to present a defense which includes the right to call witnesses.  U.S. Const. amend. VI.  See Taylor v. Illinois, 484 U.S. 400, 408, 108 S. Ct. 646 (1987) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense"); Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2142 (1986) ("an essential component of procedural fairness is an opportunity to be heard"); Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038 (1973) ("The right[] . . . to call witnesses in one's own behalf ha[s] long been recognized as essential to due process"); Washington v. Texas, 388 U.S. 14, 18-19  87 S. Ct. 1920 (1967) ("The right to offer the testimony of witnesses . . . is in plain terms the right to present a defense, the right to present the defendant's version of the facts. . . . [The accused] has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process of law.").  While the trial judge has the discretion to exclude irrelevant evidence, he must give the Defendant wide latitude to present "competent, reliable evidence . . . central to the defendant's claim of innocence".  Crane, 476 U.S. at 690, 106 S. Ct. 2142 (finding a violation of the right when

the state precluded the defendant's use of "competent, reliable evidence ... central to the defendant's claim of innocence"). See also United States v. Scheffer, 523 U.S. 303, 308, 118 S. Ct. 1261 (1998) (state court evidentiary rulings excluding evidence violate a defendant's Sixth Amendment right to present a defense if they are "arbitrary" or "disproportionate to the purposes they are designed to serve").

Mr. Cosenza has found two recent cases in which federal habeas courts have reversed state court convictions because the trial judge's refusal to permit the defense to call an expert witness violated the defendant's Sixth Amendment right to present a defense. See Howard v. Walker, 406 F.3d 114 (2nd Cir. 2005) (state trial court improperly precluded testimony of defense expert who would have contradicted prosecution expert about cause of death); Alcala v. Woodford, 334 F.3d 862 (9th Cir. 2003) (state trial court improperly excluded testimony of defense expert who would have testified that police had used suggestive hypnosis during interview of witness, rendering her memory unreliable).

Mr. Cosenza submits that the trial judge violated his Sixth Amendment right to present a defense when he denied a defense request to present Dr. Penrod's testimony on the reliability of eyewitness identification. Mr. Cosenza submits that Dr. Penrod's testimony was "competent, reliable evidence . . . central to the defendant's claim of innocence". Crane, 476 U.S. at 690, 106 S. Ct. 2142. Moreover, given that the trial judge offered absolutely

no justification for his decision to exclude this testimony and was not even willing to hold a voir dire hearing on the matter, despite a powerful proffer as to the relevance of the expert's proposed testimony, his decision was "arbitrary".  Scheffer, 523 U.S. at 308, 118 S. Ct. 1261.

In this case, expert testimony on the reliability of eyewitness identification was not merely helpful but absolutely crucial to an accurate evaluation of the evidence.  First, the Commonwealth's case against Mr. Cosenza rested entirely upon the identification by the victim, Melissa Horgan.  There was little or no evidence to corroborate the eyewitness identification.  To the contrary, there was ample reason to doubt the reliability of the identification.  Ms. Horgan awoke at 4:00 a.m. in a dark room to find an unknown man sitting at the foot of her bed.  When she asked who he was, he immediately began beating her in the head with a hard object.  She immediately covered her head with her arms to protect herself.  The attacker then climbed on her bed at which point she began kicking him.  He then fled from her apartment. This encounter in a dark room lasted no more than a few seconds and was marked throughout by surprise, stress and fear.

Ms. Horgan admitted that she could not recall many aspects of the incident because she was "hysterical".  She could not recall whether the intruder had facial hair, speaking with the police immediately after the incident, or giving them a description of the intruder.  Moreover, her recollection changed.  Initially, she said

she could not tell whether he had any hair, but later recalled not only that he had hair but the color.

Furthermore, Ms. Horgan viewed Mr. Cosenza's photograph in a simultaneous array rather than a sequential array.  Mot. to Suppr. Tr. 1:25.   Psychologists have determined that the use of simultaneous arrays leads to a "relative judgment process."  See Gary L. Wells, What Do We Know About Eye-Witness Identification?, 48 American Psychologist 553-571 (1993).[4]  Prof. Wells has explained,

> According to the relative-judgment process, eye-witnesses tend to select the lineup member who best resembles their memory of the perpetrator relative to the other members of the lineup.  In other words, witnesses compare one lineup member to the other lineup members, determine who looks most like the perpetrator, and then tend to select that person.  This process could be said to operate fairly well as long as the actual perpetrator is in the lineup.  If the real perpetrator is not in the lineup, however, there is always someone who looks more like the perpetrator than the remaining members of the lineup, and that person is at great risk of being mistakenly identified.

Gary L. Wells, Eye-Witness Identification Evidence: Science and

---

[4] Law Enforcement officials clearly have a high regard for Prof. Wells's work.  In 2004, the Boston Police Commissioner and the Suffolk County District Attorney asked Prof. Wells to serve on a Task Force on Eye-Witness Evidence.  In July 2004, a Task Force report stated, "Professor Wells is the internationally recognized academic expert on eyewitness observations, human memory, and identification procedures.  He has, for two decades, been the leader of efforts to advance scientific knowledge and integrate scientific procedures with actual police investigative work." Report of the Task Force on Eye Witness Evidence, at 3 (July 2004), available at http://www.mass.gov/da/suffolk/docs/120904.html.

Reform, The Champion, April 2005, at 12.[5]   In short, Ms. Horgan may have selected Mr. Cosenza's photograph because he looked more like her assailant than any of the other individuals in the array.

Finally, Mr. Cosenza and Ms. Horgan had been neighbors for more than a year.  Therefore, it is highly likely that she had seen him on one or more occasions prior to the assault.  Thus, it is possible that she selected his photo because he was familiar to her and not because he was her assailant.  Adding to the sense of unease about this identification, Ms. Horgan refused to view a second photo array to confirm her identification.

Moreover, the expert testimony offered was sufficiently tied to the facts of the case so that it would have aided the jury in resolving the matter.  Defense counsel's proffer made clear that Dr. Penrod would testify only about factors that were present in this case, including the effects of extreme stress, unconscious transference, a witness's level of confidence in her identification, the passage of time, and poor lighting on the accuracy and reliability of an identification.

The effects of extreme stress were relevant because Ms. Horgan

---

[5] Law enforcement officials in the Commonwealth have accepted the validity of this research.  In July 2004, the Boston Police Department adopted a series of guidelines designed to diminish the likelihood of wrongful identifications.  Report of the Task Force on Eye Witness Evidence, (July 2004), available at http://www.mass.gov/da/suffolk/docs/120904.html.  One of the guidelines adopted was a requirement that police rely exclusively on sequential presentation of photographs to witnesses rather than simultaneous arrays.  Id. at 5.

encountered her attacker in the most stressful circumstances imaginable: she awoke at 4:00 a.m., to find a strange man at the foot of her bed in his underwear.   This stranger immediately jumped on her bed and began hitting her in the head, forcing her to cover herself with her arms. Unconscious transference was relevant because Mr. Cosenza and Ms. Horgan were neighbors for more than a year and therefore she could have recognized his picture from previous encounters. Ms. Horgan's level of confidence was relevant because she testified she was "very confident" about her identification of Mr. Cosenza.   Tr. 5:97.[6]   The effects of time on memory were relevant because at least thirty hours passed between the assault and Ms. Horgan's identification of Mr. Cosenza. Finally, the effect of poor lighting was relevant because the assault took place at 4:00 a.m. in Ms. Horgan's bedroom, all of her lights were off and her blinds were closed, blocking all light from outside the apartment.

In sum, expert testimony on the reliability of Ms. Horgan's identification of Mr. Cosenza as her assailant was "competent, reliable evidence . . . central to the defendant's claim of innocence".   Crane, 476 U.S. at 690, 106 S. Ct. 2142.

---

[6] Defense counsel made a timely objection to the prosecutor's question which was sustained.   Tr. 5:97. Unfortunately, Ms. Horgan expressed her confidence in her identification before the ruling and so the jury heard her expression of certainty.   Defense counsel requested an instruction that there is no relationship between a witness's level of certainty and the accuracy of her identification but the request was denied.   Tr. 6:140.

Notwithstanding the utility of this evidence, the Magistrate seems to argue that the expert testimony would have "prejudice[d] . . . the truth-determining function of the trial process." Taylor, 484 U.S. at 414-15, 108 S. Ct. 646.  Citing a twenty-five year old state case - Commonwealth v. Francis, 453 N.E.2d 1204, 1207 (Mass. 1983) - the Magistrate claims that  "the 'aura of scientific credibility' that an expert witness brings to the stand may cause a jury to give too much weight to the testimony of an expert witness."  Report at 9.  In fact, as explained recently by the Third Circuit in United States v. Brownlee, 454 F.3d 1331 (2006), studies of exonerations resulting from DNA testing in the years since Francis was decided and research on the impact of eye-witness testimony on juries illustrate that this concern is not merely misplaced in the context of expert testimony on the reliability of eye-witness identification but completely wrong.

As an initial matter, in the words of the Massachusetts Supreme Judicial Court (SJC), "eyewitness testimony is often hopelessly unreliable."  Commonwealth v. Johnson, 650 N.E.2d 1257, 1261 (Mass. 1995).  See also Brownlee, 454 F.3d at 141 ("It is widely accepted by courts, psychologists and commentators that the identification of strangers is proverbially untrustworthy") (quotation marks and citation omitted).  With the advent of DNA testing, this experiential observation has been confirmed by empirical research.  See Gross, Jacoby, Matheson, Montgomery, & Patil, Exonerations in the United States 1989 Through 2003, 95 J.

12

Crim. L. & C. 523, 531 (2006) ("The most common cause of wrongful convictions is eye-witness misidentification" - 88% of exonerations in rape cases were the result of eye-witness misidentification. "The central problem in most rape investigations that go wrong is the mistaken identification of a defendant who is otherwise unknown to those involved.").

Furthermore, there have been major advances in the study of eye-witness identification, firmly rooted in peer reviewed empirical studies. This research is the foundation for expert testimony on the reliability of eye-witness identification. According to one commentator, who describes himself as a sceptic about behavioral science evidence:

> Ironically, the form of social science evidence which is most solidly based in 'hard' empirical science has met with the most resistance in the courts. Expert testimony concerning the limitations and weaknesses of eye-witness identification is firmly rooted in experimental foundation, derived from decades of psychological research on human perception and memory as well as an impressive peer review literature.

Mark S. Brodin, <u>Behavioral Science Evidence in the Age of Daubert: Reflections of a Skeptic</u>, 73 U. Cin. L. Rev. 867, 889-90 (2005) (footnotes omitted). This reality has caused many courts to revise their opinion of the utility of expert testimony in helping juries to evaluate the reliability of eye-witness testimony. <u>See</u> <u>State v. Copeland</u>, 226 S.W.3d 287 (Tenn. 2007) ("It is the educational training of the experts and empirical science behind the reliability of eye-witness testimony that persuades us to depart

from [a rule excluding all expert testimony on the reliability of eye-witness identification].  Times have changed.").  See also Jacqueline McMurtrie, The Role of the Social Sciences in Preventing Wrongful Convictions, 42 Am. Crim. L. Rev. 1271, 1273 (2005) ("with the increased awareness of the role that mistaken identification . . . play[s] in convicting the innocent, a new trend is developing regarding the admissibility of expert testimony").

Empirical research in the field demonstrates that the primary concern in eye-witness identification cases is not that jurors will place too much weight on the opinion of experts, but rather that they will place too much trust in the accuracy of the identification by the eye-witness.  Several courts, including the SJC, have recognized that "the average person thinks that eyewitness testimony generally is more accurate than it actually is."  Commonwealth v. Zimmerman, 804 N.E.2d 336, 344 (Mass. 2004) (Cordy, J. concurring) (quoting Devenport, Eyewitness Identification Evidence, 3 Psychol. Pub. Pol'y & L. 338, 347 (1997)).  See also United States v. Hines, 55 F. Supp. 2d 62, 72 (D. Mass. 1999) ("While jurors may think that they can draw the appropriate inferences about eyewitness identification directly from their life experiences, their confidence may be misplaced"); State v. Chapple, 660 P.2d 1208, 1221 (Ariz. 1983) (recognizing that contrary to "common sense", psychological studies indicate that (1) stress causes inaccuracy of perception and distorts subsequent recall and (2) a witness's level of confidence in her

14

identification has no relationship to the accuracy of that identification); Johnson, 650 N.E.2d at 1261 (juries have a tendency to be "unduly receptive to eyewitness evidence"); Copeland, 226 S.W.3d at 287 ("In our view, it is far more likely for the jury to accredit the eyewitness than the expert"); State v. Long, 721 P.2d 483, 490 (Utah 1986) ("Although research has convincingly demonstrated the weakness inherent in eyewitness identification, jurors are, for the most part, unaware of these problems.  People simply do not accurately understand the deleterious effects that certain variables can have on the accuracy of the memory processes of an honest eyewitness.").

Notwithstanding the common assumption that the factors affecting the reliability of identifications are a matter of "common knowledge" or "common sense", psychologists have demonstrated that this is not the case.  See Brownlee, 454 F.3d at 142 ("[W]hile science has firmly established the inherent unreliability of human perception and memory, this reality is outside the jury's common knowledge, and often contradicts jurors' 'commonsense' understandings") (quotation marks and citation omitted); Long, 721 P.2d at 490 ("the common knowledge that people do possess often runs contrary to documented research findings"); Yarmey, Expert Testimony: Does Eye-Witness Memory Research Have Probative Value for the Courts, Canadian Psychology 42(2), 92-100 (2001); Cutler, B.L. & Penrod, S.D. Mistaken Identification: The Eyewitness, Identification and the Law (Cambridge Univ. Press)

(1995).

As a result, several courts have concluded that expert testimony would be helpful to a jury that must assess the reliability of an eyewitness identification - and in some cases have held that the exclusion of such testimony was reversible error. See Brownlee, 454 F.3d at 144 (reversible error to exclude expert testimony on, among other things, the correlation between confidence and accuracy of an eye-witness identification); United States v. Stevens, 935 F.2d 1380, 1406-07 (3rd Cir. 1991) (same); United States v. Smith, 736 F.2d 1103 (6th Cir. 1984) (expert testimony on the effects of unconscious transference and stress on the reliability of eyewitness identification would have been helpful to jury); United States v. Graves, 465 F. Supp. 2d 450 (E.D. Pa. 2006) (expert testimony on lack of correlation between confidence and accuracy of eye-witness identification admissible under Fed. R. Evid. 702); State v. Skamarocius, 731 P.2d 63 (Alaska Ct. App. 1987) (reversible error to exclude expert testimony on, among other things, effects of stress on reliability of identification and the correlation between confidence and accuracy of an eye-witness identification); Chapple, 660 P.2d at 1221 (same); People v. McDonald, 690 P.2d 709, 726 (Cal. 1984) (reversible error to exclude expert testimony on, among other things, effects of stress on reliability of identification); Commonwealth v. Cruz, 839 N.E.2d 324, 331 (Mass. 2005) (where there is evidence of eye-witness's confidence in the accuracy of her

identification, defendant is free to call an expert witness on "the relationship between witness confidence and accuracy"); Copeland, 226 S.W.3d at 287 (reversible error to exclude expert testimony on the reliability of cross-racial identification); State v. Moon et al., 726 P.2d 1263, 1267 (Wash. App. 1986) (reversible error to exclude expert testimony on the effects of violence, stress and brevity on the reliability of eyewitness identification).

In fact, in United States v. Hines, the defense offered the testimony of a psychology professor for many of the same reasons that the expert testimony was offered in this case, including

> the effects of stress on identification, the effects of time on memory as it relates to identification, the 'confidence-accuracy' phenomenon which suggests the absence of any correlation between the amount of confidence expressed by an eyewitness in his or her memory and the accuracy of that witness' identification . . . [and] the transference phenomenon by which a witness may believe that a face looks familiar but is unable to say whether her familiarity comes from seeing [the suspect previously] or from the [crime], etc.

55 F. Supp. 2d at 71.   After admitting the testimony of the eyewitness expert, the trial judge in Hines wrote "[i]n my judgment, the accuracy of these proceedings was enormously enhanced by treating the jury to all sides of the eyewitness debate, rather than by assuming there was no controversy, that the issue, notwithstanding [psychological studies challenging the reliability of eyewitness identification], is clear." Id. at 73. The District Court's conclusions in Hines illustrate that expert testimony on the reliability of eye-witness identification serves the public

interest identified by the Supreme Court in Taylor v. Illinois as the core purpose of the compulsory process clause. See Taylor, 484 U.S. at 411, 108 S. Ct. 646 ("The defendant's right to compulsory process is itself designed to vindicate the principle that the ends of criminal justice would be defeated if judgements were to be founded on a partial or speculative presentation of the facts.").

Flying directly into the face of this case law, the Magistrate challenges the claim that expert testimony would have been helpful to the jury in evaluating the effects of stress on the reliability of Ms. Horgan's identification. The Magistrate asserts that "the rise in the level of stress is within the realm of common knowledge. A jury would not need the testimony of an expert to understand that a stressful situation may make it harder to appropriately identify the intruder." Report at 12-13. In support of this assertion, the Magistrate cites United States v. Rodriguez-Berrios, 445 F. Supp. 2d 190, 194 (D.P.R. 2006). In fact, the Court in Rodriguez-Berrios suggested precisely the opposite about the admissibility of expert testimony on the effects of stress on the reliability of an identification. After rejecting the defendant's claim that expert testimony on the effects of lighting on the identification process might be useful to a jury in assessing the reliability of an identification, the court stated "neither defendant's proffer nor anything else on the record suggests that this is a case where expert testimony on eyewitness identification might assist the jury because special circumstances

18

exist, such as where an identification is made . . . under conditions of extreme stress." Id.  In other words, the Court suggested that an identification made under extreme stress is a "special circumstance" warranting expert testimony to assist the jury in evaluating the reliability of the identification.  This holding is consistent with the several cases cited above which have held that expert testimony on the effects of stress on the reliability of eyewitness identification would have been helpful to the jury. See Smith, 736 F.2d 1103; Hines, 55 F. Supp. 2d at 71; Skamarocius, 731 P.2d at 63; Chapple, 660 P.2d at 1221; McDonald, 690 P.2d at 726; Moon, 726 P.2d at 1267.

Moreover, the Magistrate completely ignores at least three other topics upon which Mr. Cosenza's expert would have offered testimony: (1) the phenomenon of unconscious transference; (2) the lack of a correlation between confidence and accuracy of an eye-witness identification; and (3) the effect of the passage of time on the accuracy of an eye-witness identification.

As noted above, the Magistrate made no effort to distinguish the long list of authority Mr. Cosenza gathered for the proposition that it is reversible error to exclude expert testimony designed to help a jury more accurately assess the reliability of eye-witness identification where that identification is central to the government's case.  Instead, the Magistrate suggests that the judge's decision to exclude expert testimony on the reliability of the identification at the heart of this case amounted to harmless

error because there was "other circumstantial evidence helping establish Cosenza's motive and ability to gain access to the apartment complex." Report at 10.  The Magistrate cites (1) Mr. Payton's testimony that he had seen Mr. Cosenza "around the premises", (2) Mr. Cosenza's desire for reward money and (3) his unwillingness to speak to police on the day after the incident as evidence, respectively, of (1) his access to Ms. Horgan's front door, (2) his motive and (3) his consciousness of guilt.  Id.

As an initial matter, Mr. Cosenza has argued that the exclusion of his expert's testimony violated his Sixth Amendment right to present all evidence favorable to his case and to a fair trial.  Therefore, assuming the Court agrees that the exclusion of this expert testimony violated his Sixth Amendment rights, the issue is whether this error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828 (1967) (violation of defendant's constitutional rights requires reversal unless the error is harmless beyond a reasonable doubt).

Furthermore, Mr. Cosenza refuted all of the evidence cited by the Magistrate.  First, whether he had access to the hall outside Ms. Horgan's front door, there was no sign that the intruder actually entered through her front door, which was locked.  Tr. 5:83,152.  Rather, the police determined that the intruder entered the apartment through the window of a second bedroom to which he gained access from a balcony.  Tr. 5:153, 161-62.  Second, there was no evidence that the intruder stole money or anything else.

20

Tr. 5:135.  To the contrary, to the extent that there was any evidence of the intruder's motive, it appeared to be sexual because he wore no pants and he climbed into Ms. Horgan's bed when she awoke.  Tr. 5:79-80.  Third, Mr. Payton explained that Mr. Cosenza helped him find his stolen dirt bike at some point prior to the Horgan break-in.  Mr. Payton decided to call the police to report that the bike had been found, at which point Mr. Cosenza fled the scene because he had an outstanding arrest warrant.  Tr. 5:58.  In other words, Mr. Cosenza had a motive for fleeing from the police before the Horgan break-in.

In any event, Ms. Horgan's emotional in court eye-witness identification was clearly the centerpiece of the Commonwealth's case.  There can be no dispute that it was the most important piece of evidence presented by the Commonwealth and transformed a non-viable circumstantial evidence case into an emotionally powerful conviction.  In fact, the jury asked for a reinstruction on good faith error in relation to eye-witness testimony.  Tr. 7:1-2.  This fact illustrates not only that the identification evidence was at the center of the jury deliberations but that the jury was clearly troubled by the Commonwealth's identification evidence.  Therefore, the Court's decision to exclude the testimony of Mr. Cosenza's expert witness clearly prejudiced him by preventing him from pursuing a significant avenue of attack on the evidence which was at the heart of the Commonwealth's case and the jury's deliberations.  See Copeland, 226 S.W.3d at 287 (reversible error

to exclude expert testimony on reliability of eye-witness identification despite other circumstantial evidence of defendant's guilt).   In short, it is simply untenable to claim that the exclusion of the expert's testimony was harmless beyond a reasonable doubt.

Finally, the Magistrate suggests that the trial judge's jury instruction on eye-witness identification "was sufficient in making the jury aware of the possible weaknesses in eye-witness identification."   Report at 14.   Mr. Cosenza respectfully disagrees.   To the contrary, the judge's instruction offered no insight in to any of the topics of proposed expert testimony discussed above.   Specifically, the judge made no mention of the effects of extreme stress or unconscious transference on the reliability of an identification or the lack of a correlative relationship between a witness's confidence in her identification and the accuracy of that identification.   In short, the judge's instruction did nothing to address the aspects of the eye-witness testimony Mr. Cosenza sought to address with expert testimony.

For all of these reasons, this Court's rejection of this claim was unreasonable.   Mr. Cosenza has, at the very least, made a "substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   Stated differently, "the District Court's application of AEDPA to petitioner's constitutional claims . . . was debatable amongst jurists of reason."   Miller El, 537 U.S. at 337.   Therefore, he is entitled to a COA on this issue.   See id. at

22

338 ("a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail").

## **Conclusion**

For all of the forgoing reasons, Mr. Cosenza respectfully requests that this Court grant his application for a Certificate of Appealability in connection with his Petition for Habeas Corpus.

Dated:     November 14, 2007          Respectfully Submitted,

                                      /s/ Chauncey B. Wood
                                      Chauncey B. Wood, BBO# 600354
                                      Shea, LaRocque & Wood, LLP
                                      47 3rd Street, Suite 201
                                      Cambridge, MA 02141
                                      Tel. (617) 577-8722

<u>Certificate of Service</u>

I hereby certify that this document, which was filed on this date through the ECF system, will be sent electronically on this date to Randall Ravitz, counsel for the Respondent in this matter, John Marshall.

Date: November 14, 2007          /s/ Chauncey B. Wood
                                 Chauncey B. Wood